UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION AT LEXINGTON

| | |
|---|---|
| **BROOKDALE SENIOR LIVING INC. et al,**<br><br>    **Plaintiffs,**<br><br>V.<br><br>**MARILYN O. HIBBARD,**<br><br>    **Defendant.** | **CIVIL ACTION NO. 5:13-289-KKC**<br><br><br>**OPINION & ORDER** |

\*\*\* \*\*\* \*\*\*

This matter is before the Court on a motion by the three plaintiff corporations to compel arbitration and enjoin the defendant from pursuing her parallel suit in state court. (DE 6). Defendant Marilyn O. Hibbard objects to the motion and has filed her own motion to dismiss. (DE 4). She contends that this Court should abstain from hearing this action in light of the pending state-court matter; that the arbitration agreement at issue is invalid and unenforceable; and that the Court should not exercise its power to enjoin her from continuing the prosecution of her state-court action. For the following reasons, the Court will deny the defendant's motion to dismiss, and grant the plaintiffs' motion to compel arbitration and enjoin the defendant.

I.

On July 22, 2013, Defendant Marilyn O. Hibbard filed a negligence suit in Fayette Circuit Court in Fayette County, Kentucky regarding her care and treatment during her residency at Homewood Residence at Richmond Place. *See Marilyn O. Hibbard v. Brookdale Senior Living Inc., et al.*, Civil Action File No. 13-CI-3046 (Circuit Court of Fayette County, Ky., Division 9). The plaintiffs subsequently filed the instant suit on September 4, 2013, alleging that Hibbard's claims in state court are subject to a binding arbitration agreement and she should be enjoined from

proceeding any further with her state-court action. The plaintiffs invoke this Court's diversity jurisdiction and seek relief under the Federal Arbitration Act as well as the Anti-Injunction Act. Hibbard, on the other hand, contends that the arbitration agreement is invalid and unenforceable, and that even if this were not the case the Court should abstain from hearing the present action under the doctrine of *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976).

The arbitration agreement at issue in this case was a mandatory component of Hibbard's Residency Agreement for her stay at Homewood Residence. Section V of the Residency Agreement was titled "Arbitration and Limitation of Liability Provision," which contained three subsections. On its face Section V purports to make severable any provisions the Court might deem unenforceable. It states that if "any of sub-sections A, B or C provided below, or any part thereof, be deemed invalid, the validity of the remaining sub-sections, or parts thereof, will not be affected." (DE 1-1, at 7).

Subsection A outlines the provisions of the arbitration agreement. The first sentence of Subsection A states the follow:

> Any and all claims or controversies arising out of, or in any way relating to, this Agreement or your stay at the Community, excluding any action for eviction, and including disputes regarding interpretation of this Agreement, whether arising out of State or Federal law, whether existing or arising in the future, whether for statutory, compensatory or punitive damages and whether sounding in breach of contract, tort or breach of statutory duties, irrespective of the basis for the duty or the legal theories upon which the claim is asserted, shall be submitted to binding arbitration, as provided below, and shall not be filed in a court of law.

(DE 1-1, at 7). The next sentence in Subsection A states in bold text that **"[t]he parties to this Agreement further understand that a jury will <u>not</u> decide their case**." (DE 1-1, at 7).

Following Subsection A is the "Limitation of Liability Provision," which purports to limit the amount of damages each party would have to pay in the event of future litigation. This provision, marked as Subsection B, is distinct from the prior provisions outlining the arbitration requirements.

Finally, Subsection C is titled, "Benefits of Arbitration and Limitation of Liability Provisions." This subsection outlines what the parties agree are the benefits of the arbitration agreement and limitation of liability. It states that "[t]he parties' decision to select arbitration is supported by the potential cost-effectiveness and time-savings offered by selecting arbitration, which may avoid the expense and delay of judicial resolution in the court system." (DE 1-1, at 10). Significantly, at the end of Subsection C, and again in bold, emphasized text, the agreement states as follows:

> **The undersigned acknowledges that he or she has been encouraged to discuss this Agreement with an attorney.**
>
> **The parties to this Agreement further understand that a jury will <u>not</u> decide their case.**

(DE 1-1, at 10).

## II.

As a threshold matter, Hibbard asks the Court to abstain from hearing the merits of this action on the basis that there is a parallel suit pending in state court. "In certain 'exceptional' circumstances, [ ] a federal district court may abstain from exercising its subject matter jurisdiction due to the existence of a concurrent state court proceeding, based on 'considerations of wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation.'" *PaineWebber, Inc. v. Cohen*, 276 F.3d 197, 206 (6th Cir. 2001) (quoting *Colorado River*, 424 U.S. at 817). But "[a]bstention from the exercise of federal jurisdiction is the exception, not the rule," and this "extraordinary and narrow exception" is only justified when it "would clearly serve an important countervailing interest." *Colorado River Water*, 424 U.S. at 813.

As such, "[t]he decision to dismiss a federal action because of a parallel state-court action rests 'on a careful balancing of the important factors as they apply in a given case, with the balance *heavily weighted in favor of the exercise of jurisdiction*." *Great Earth Cos., Inc. v. Simons*, 288 F.3d 878, 886 (6th Cir. 2002) (emphasis added) (quoting *Moses H. Cone Memorial Hosp. v. Mercury Construction Corp.*, 460 U.S. 1, 16 (1983)).

Courts consider roughly eight factors when determining whether abstention under *Colorado River* is necessary. *PaineWebber,* 276 F.3d at 206 (citing *Romine v. Compuserve Corp.*, 160 F.3d 337, 340–41 (6th Cir. 1998)). These factors are:

> (1) whether the state court has assumed jurisdiction over any res or property; (2) whether the federal forum is less convenient to the parties; (3) avoidance of piecemeal litigation; . . . (4) the order in which jurisdiction was obtained[;] . . . (5) whether the source of governing law is state or federal; (6) the adequacy of the state court action to protect the federal plaintiff's rights; (7) the relative progress of the state and federal proceedings; and (8) the presence or absence of concurrent jurisdiction.

*Id.* (citing *Romine*, 160 F.3d at 340–41). Although a few of these factors weigh in favor of abstention, none are strong enough to make this case an exceptional circumstances necessitating abstention. Moreover, the factors identified as the most important counsel in favor of exercising its jurisdiction.

The first two factors weigh against abstention. In a similar case where "the state court did not assume jurisdiction over any res or property," and both courts are geographically convenient, the Sixth Circuit has found these facts support exercising jurisdiction. *PaineWebber*, 276 F.3d at 207. On the other hand, factors four, seven, and eight, favor abstention—but only very slightly. The state court assumed jurisdiction first, but only by a few months, and nothing in the record indicates the suit has progressed very far. The slight time difference between the state- and federal-court filings is insufficient to persuade the Court to abstain. Where "there is no indication

4

that any significant proceedings have taken place in the state court," the importance of which court assumed jurisdiction first is diminished significantly. *See Great Earth*, 288 F.3d at 887.

The "most important" factor is the third factor, which asks "whether there is a 'clear federal policy evinc[ing] . . . the avoidance of piecemeal adjudication' found within the statutory scheme at issue." *Answers in Genesis of Kentucky, Inc. v. Creation Ministries Int'l., Ltd.*, 556 F.3d 459, 467 (6th Cir. 2009). The Sixth Circuit Court of Appeals has held that "[i]n the case of the Federal Arbitration Act, there most clearly is not such a policy." *Id.* at 467. This is because the FAA "requires district courts to compel arbitration . . . when one of the parties files a motion to compel, *even where the result would be the possibly inefficient maintenance of separate proceedings in different forums.*" *Id.* at 467–68. Thus, the most important factor when determining whether to abstain counsels against abstention in this case.

The fifth factor, whether federal or state law is the source of the dispute, also favors exercising jurisdiction. Here, the issues involve questions of both state and federal law. Important, however, is the fact that the "FAA provides the source of law for interpreting the arbitration clause[.]" *PaineWebber*, 276 F.3d at 208. Although it's true that "this factor is less significant where the state and federal courts have concurrent jurisdiction," *id.*, the Supreme Court has been careful to note that the court's "task in cases such as this is not to find some substantial reason for the *exercise* of federal jurisdiction . . . ; rather, the task is to ascertain whether there exist 'exceptional circumstances' . . . to justify the *surrender* of that jurisdiction." *Moses H.*, 460 U.S. at 25–26. Thus, to the extent that this case raises mixed questions of both federal and state law—with the FAA at the heart of the dispute—the fifth factor weighs in favor of exercising jurisdiction.

Finally, the sixth factor, which asks whether the state court will provide adequate protection of the plaintiffs' federal rights, favors abstention. Hibbard argues that state court is more than capable of interpreting and applying the FAA, and that there is no reason to believe the plaintiffs'

5

rights are in jeopardy in state court. Hibbard's argument has support from the Sixth Circuit: in *PaineWebber*, the court held that because the FAA is "binding on state courts that interpret contracts involving interstate commerce," the sixth factor weighs in favor of abstaining. *PaineWebber*, 276 F.3d at 208.

In viewing all of the factors together, it's clear that the balance in this case weighs against abstention and in favor of the Court exercising its jurisdiction. Factors one, two, three, five, and six all counsel against abstention, while the remaining factors only slightly favor the opposite. Significantly, the third factor—which asks whether there is a clear federal policy evincing the avoidance of piecemeal litigation—is the most important factor and it weighs in favor exercising subject-matter jurisdiction. Courts both within this state and within the Sixth Circuit Court of Appeals have declined to abstain under *Colorado River* in similar circumstances, and this Court will do the same. *See PaineWebber*, 276 F.3d at 209; *GGNSC Louisville Hillcreek, LLC v. Warner*, 2013 WL 6796421, *6 (W.D. Ky. Dec. 19, 2013).

**III.**

Having determined that it will not abstain from ruling on the merits of this action, the Court turns to the remaining issues. The plaintiffs move this Court to compel Hibbard to submit her claims currently pending in state court to arbitration, as required in her Residency Agreement. They further ask the Court to enjoin Hibbard from continuing to pursue her state-court action. In response, Hibbard objects to enforcement of the arbitration agreement on the grounds that it is unconscionable, against public policy, and was signed by an agent without the authority to do so. Her objections are without merit and will be denied.

## A. Validity of the Arbitration Agreement

"When considering a motion to . . . compel arbitration under the" FAA, courts engage in a four-step analysis. *Stout v. J.D. Byrider*, 228 F.3d 709, 714 (6th Cir. 2000). The first is to "determine whether the parties agreed to arbitrate." *Id.* If so, then the second step is to consider the scope of the agreement. *Id.* Third, "if federal statutory claims are asserted, [the Court] must consider whether Congress intended those claims to be nonarbitrable." *Id.* Finally, "if the court concludes that some, but not all, of the claims in the action are subject to arbitration, it must determine whether to stay the remainder of the proceedings pending arbitration." *Id. See also Compuserve, Inc. v. Vigny Int'l Finance, Ltd.*, 760 F. Supp. 1273, 1278 (S.D. Ohio 1990). In the present case, the defendant only contests the first issue, which is whether the parties entered into a valid arbitration agreement.

Hibbard contends that the arbitration agreement is invalid for a variety of reasons spanning unconscionability, public policy, and agency law. Nearly all of the reasons advanced by Hibbard are facially without any merit and have been repeatedly rejected by both federal and state courts.

The Court examines this case under the backdrop of a "strong federal policy in favor of arbitration." *See Hurley v. Deutsche Bank Trust Co. Ams.*, 610 F.3d 334, 338 (6th Cir. 2010) (quoting *Albert M. Higley Co. v. N/S Corp.*, 445 F.3d 861, 863 (6th Cir. 2006). This policy arises from the FAA, which "was designed to override judicial reluctance to enforce arbitration agreements." *Stout*, 228 F.3d at 714. Pursuant to the FAA, arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. But when evaluating the validity of an arbitration agreement, "any ambiguities in the contract or doubts as to the parties' intentions should be resolved in favor of arbitration." *Id.* (citing *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626

(1985) ("Thus, as with any other contract, the parties' intentions control, but those intentions are generously construed as to issues of arbitrability.")).

But, as Hibbard correctly notes, "the federal policy in favor of arbitration is not an absolute one. Arbitration under the Federal Arbitration Act is 'a matter of consent, not coercion.'" *Albert M. Higley Co.*, 445 F.3d at 863 (quoting *Volt Info. Scis., Inc. v. Bd. of Trs. Of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989)). "[N]o matter how strong the federal policy favors arbitration, arbitration is a matter of contract between the parties, and one cannot be required to submit to arbitration a dispute which it has not agreed to submit to arbitration." *Simon v. Pfizer Inc.*, 398 F.3d 765, 775 (6th Cir. 2005) (internal quotations omitted). For this reason, state law regarding the enforceability of contracts applies with equal force to the validity of contracts to arbitrate.

It is on this point that Hibbard grounds her argument, claiming that the arbitration agreement is an invalid contract under Kentucky common law, and therefore unenforceable under the FAA. Hibbard's objection to the arbitration agreement comes largely in four parts. She argues that (1) the contract is unconscionable under Kentucky common law; (2) the contract violates public policy in light of the statutory protections afforded to nursing home residents; (3) the limitation on damages violates Kentucky law; and (4) David Hibbard, who signed the agreement on behalf of the defendant, did not have the authority to do so.

The first three of Hibbard's objections have been squarely rejected by numerous courts. Under Kentucky law, "[t]he doctrine [of unconscionability] is used by the courts to police the excesses of certain parties who abuse their right to contract freely. It is directed against one-sided, oppressive and unfairly surprising contracts, and not against the consequences per se of uneven bargaining power or even a simple old-fashioned bad bargain." *Conseco Fin. Servicing Corp. v. Wilder*, 47 S.W.3d 335, 341–42 (Ky. Ct. App. 2001) (quoting *Louisville Bear Safety Serv., Inc. v. South Central Bell Tel. Co.*, 571 S.W.2d 438, 440 (1978)). This doctrine is a "narrow exception" to the

8

fundamental rule that "absent fraud in the inducement, a written agreement duly executed by the party to be held, who had an opportunity to read it, will be enforced according to its terms." *Schnuerle v. Insight Commc'ns Co., L.P.*, 376 S.W.3d 561, 575 (Ky. 2012) (quoting *Conseco*, 47 S.W.3d at 341–42). According to Hibbard, the arbitration agreement in this case is unconscionable because it is "overbroad," does not bind the facility, lacks consideration, and was "effectively mandatory." Not only do these arguments lack merit, most fly in the face of the clearly-established federal policy favoring arbitration.

Hibbard's arguments against enforcing this agreement—at their core—are nothing more than objections to arbitration agreements *in general*, and therefore directly contradict the policy embodied in the FAA. Like many arbitration agreements, the one in the instant case cites as consideration the economic efficiencies gained through arbitration. Hibbard refers to this consideration as "nonsensical" and accuses the plaintiff of engaging in "serious swindling." (DE 7, at 5). While Hibbard might believe that these significant economic efficiencies are "nonsensical," courts have recognized this benefit of arbitration as one of the reasons the FAA was instituted in the first place. *See Stout*, 228 F.3d 714 ("The FAA was designed to . . . provide parties with a speedier and less costly alternative to litigation."). Hibbard also claims that the agreement is not mutually binding because any claim the facility might have against Hibbard is "not the same species as personal injury torts," and thus the facility "cedes nothing" by agreeing to arbitration. (DE 7, at 4). Again, this is nothing more than an attack on arbitration itself: if the court system is sufficient to resolve both the claims brought by the facility and the resident, the only distinguishing feature here is that Hibbard regards *arbitration itself* as insufficient, which says nothing about whether the contract is unconscionable.

Nor is there any merit to Hibbard's suggestion that the agreement is procedurally unconscionable because it is a contract of adhesion. As the Supreme Court of Kentucky has said,

9

"[a]dhesion contracts are not *per se* improper. On the contrary, they are credited with significantly reducing transaction costs in many situations." *Schnuerle*, 376 S.W.3d at 576. The Court in *Schnuerle* rejected the argument that a "non-negotiable, take it or leave it, adhesion contract" containing an arbitration agreement was procedurally unconscionable. *Id.* Instead, the Court found that where the agreement "was not concealed or disguised" and "its provisions [were] clearly stated such that purchasers of ordinary experience and education are likely to be able to understand it, at least in its general import; and its effect is not such as to alter the principal bargain in an extreme or surprising way," such agreements are not unconscionable. *Id.* at 576–77. Like *Schnuerle*, the agreement in this case was not concealed or disguised. On the contrary, the arbitration agreement was contained within its own subsection of the contract, repeatedly advised the parties to consult with an attorney before signing it, and made conspicuous all the important terms—such as emphasizing within the text that the parties were agreeing to forgo any trial by jury and submit their claims to arbitration. It is difficult to imagine what greater lengths the plaintiffs could have taken to make the arbitration agreement in this case more transparent to the consumer.

Hibbard's claim that the arbitration agreement is against public policy must similarly be rejected. She argues that under Kentucky law it is against public policy for a mandatory arbitration agreement to be contained within an admission contract at a nursing-home facility. Even if this is true, the FAA overrides such a public policy. *See AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1747–48 (2011) (explaining that "a court may not rely on the uniqueness of an agreement to arbitrate as a basis for a state-law holding that enforcement would be unconscionable") (internal quotations omitted). In *Marmet Health Care Center, Inc. v. Brown*, 132 S. Ct. 1201 (2012), the Supreme Court reversed a decision by the West Virginia Supreme Court that held several binding arbitration agreements within a series of nursing-home contracts

invalid. *Id.* at 1203–04. The West Virginia Supreme Court determined that these arbitration clauses were against the state's public policy, which the FAA did not pre-empt. But in a per curiam opinion, the Supreme Court of the United States flatly rejected this claim, holding that the FAA "requires courts to enforce the bargain of the parties to arbitrate." *Id.* at 1203. In doing so, the Court reinforced the rule it set out in *Concepcion*, which states that "[w]hen state law prohibits outright the arbitration of a particular type of claim, . . . [t]he conflicting [state law] is displaced by the FAA." *Concepcion*, 131 S. Ct. at 1747.

The Supreme Court's logic applies with just as much force in the present case. Hibbard contends that Kentucky's public policy forbids mandatory arbitration agreements in the context of nursing home contracts. But such a state law that singles out arbitration as applied to a particular class of claims is preempted by the FAA. Thus, even if the public policy of Kentucky would render a mandatory arbitration agreement for admission to a nursing home unenforceable, the FAA controls.

The third argument advanced by Hibbard is that the entire arbitration agreement is unenforceable because the contract contains a limitation of liability clause that Hibbard believes is invalid under Kentucky law. Under Kentucky law, the unenforceability of a particular provision in a contract does not render the entire agreement unenforceable or unconscionable. *See Francis v. Cute Suzie, LLC*, 2011 WL 2174348, *1, Civil Action No. 3:10-CV-00704 (W.D. Ky. June 2, 2011); *Schnuerle*, 376 S.W.3d at 565. Thus, the Court need not consider whether the limitation on liability is itself enforceable if—as is the case here—the clause is severable from the agreement to arbitrate.

Hibbard rests her argument on the holding in *Mortgage Electronic Registration Systems, Inc. v. Abner*, 260 S.W.3d 351 (Ky. Ct. App. 2008), a Kentucky Court of Appeals case that found an arbitration agreement substantively unconscionable because it was intertwined with a provision

11

prohibiting the arbitrator from awarding punitive damages. *Id.* at 355. Importantly, the *Abner* court found that the arbitration agreement was unconscionable because the *arbitration clause itself* imposed a limitation on damages that deprived one of the parties of their substantive statutory remedies. *Id.* But *Abner* does not stand for the proposition that all arbitration agreements are unenforceable simply because the contract contains a separate and unconscionable provision. Rather, as subsequent courts construing *Abner* have emphasized, the question is whether the arbitration clause is so intertwined with the unconscionable provision that the two clauses cannot be severed from each other. *See Francis*, 2011 WL 2174348 at *3–4 (holding that an arbitration clause is valid despite an accompanying limitation on liability because the latter is severable in the event it is found unconscionable). In *Abner*, the arbitration clause itself directly limited the arbitrator's ability to award damages and expressly prohibited it from modifying the terms of the contract. There was no way for an arbitrator to sever the unconscionable clause from the rest of the agreement.

But the instant case presents no such difficulty. The arbitration agreement in Hibbard's contract is clearly severable from the limitation on liability. Although they appear in the same section of the Residency Agreement, the two provisions are outlined in separate subsections and contain nothing that would suggest the validity of one is dependent on the other. In fact, the contract explicitly states that if either provision is found invalid and unenforceable, it may be severed from the remaining agreement. (DE 1-1, at 7). Because these clauses are severable from each other, and the arbitrator is granted the express authority to interpret the terms of the contract as needed, this Court need not resolve whether the former is unconscionable. Such a decision falls within the scope of the arbitrator's delegated authority.

The last of Hibbard's objections to the enforceability of the arbitration agreement is that the durable power of attorney granted to David Hibbard, which he used to sign the Residency

Agreement on behalf of Marilyn Hibbard, did not grant him the authority to bind her to arbitration. Whether David Hibbard had the authority to sign the arbitration agreement under his power of attorney is determined by state law. In Kentucky, "an agent's authority under a power of attorney is to be construed with reference to the types of transaction expressly authorized in the document and subject always to the agent's duty to act with the 'utmost good faith.'" *Ping v. Beverly Enterprises, Inc.*, 376 S.W.3d 581, 592 (Ky. 2012) (quoting *Wabner v. Black*, 7 S.W.3d 379, 381 (Ky. 1999)). Significantly, the Kentucky Supreme Court has held that when an agent engages in an action within his expressly delegated authority, the action might nonetheless be invalid if its incidental effect is to "create legal consequences for a principal that are significant and separate from the transaction specifically directed by the principal." *Id.* at 593 (quoting Restatement (Third) of Agency § 2.02). In other words, Kentucky law holds that even when an agent has the express authority to engage in a particular transaction, exercise of that authority might be considered unauthorized if the incidental consequences of the transaction are so significant that they call into question the agent's good faith.

Hibbard argues that such is the case in the instant matter. She contends that although David Hibbard had the authority to sign the Residency Agreement in order to ensure her medical care, the "legal consequences" of the arbitration agreement "are significant and separate from the transaction specifically directed by the principal," and thus he exceeded his authority under his durable power of attorney when he signed it. To construct this argument, Hibbard relies on *Ping*, where the Supreme Court of Kentucky found that a power of attorney agreement specifically authorizing the agent to make decisions reasonably necessary for the principal's medical care was not sufficient to authorize the agent's decision to execute a binding but optional arbitration agreement as part of a residency agreement at a nursing home.

13

But in making her argument, Hibbard ignores clear language in *Ping* distinguishing it from the circumstances of the instant case. In *Ping*, the Supreme Court of Kentucky explicitly based its holding on the fact that the agent was only given the authority to make decisions reasonably necessary for the principal's medical care, and the arbitration agreement was *optional*. By agreeing to the arbitration clause, the agent significantly limited the legal rights of the principal and did so in a situation where it was *not necessary*. Unlike *Ping*, the arbitration agreement in the present case was a mandatory component of the Residency Agreement. And as the Court in *Ping* stated, "where an agreement to arbitrate is presented to the patient as a condition of admission to the nursing home, courts have held that the authority incident to a health-care durable power of attorney includes the authority to enter such an agreement." *Ping*, 376 S.W.3d at 593.

Even if *Ping* had not been careful to distinguish its holding from cases like the present one, David Hibbard's durable power of attorney authorized a much broader set of actions than that found in *Ping*. The agent in *Ping* had only the authority to make reasonably necessary medical decisions and was thus limited to acting in pursuit of that power. David Hibbard, however, was granted the power "to institute, prosecute, appear in, defend, compromise, arbitrate, settle, or dispose of any legal, equitable, or administrative hearings, actions, suits, attachments, claims or other proceedings . . . to which I am or may become a party or in which I have an interest." (DE 1-3, at 1). David Hibbard's authority to sign an arbitration agreement was an express component of his authority, rather than an incidental consequence of his power to make healthcare decisions. Thus, the defendant's argument that David Hibbard lacked authority to enter into the arbitration agreement on her behalf is without merit.

Finally, in her motion to dismiss Hibbard makes one more argument as to why this Court should not enforce the arbitration agreement pursuant to the requirements of the FAA. She contends that the arbitration agreement in this case is not governed by the FAA because it does

14

not evidence a transaction involving interstate commerce. The FAA applies to "contract[s] evidencing a transaction involving commerce." 9 U.S.C. § 2. Under this provision, the scope of the FAA mirrors Congress's Article I power to regulate interstate commerce. *See Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56 (2003) ("We have interpreted the term 'involving commerce' in the FAA as the functional equivalent of the more familiar term 'affecting commerce'—words of art that ordinarily signal the broadest permissible exercise of Congress' Commerce Clause power."). Hibbard contends that the arbitration agreement evidences only an *intrastate* contract and is therefore outside the scope of the FAA. But because its scope runs parallel to the Commerce Clause, "the FAA encompasses a wider range of transactions than those actually . . . within the flow of interstate commerce." *Id*. This means that the FAA will extend to transactions "in individual cases without showing any specific effect upon interstate commerce if in the aggregate the economic activity in question would represent a general practice . . . subject to federal control." *Id*. at 56–57.

There is no dispute that the transaction in this case falls within the scope of the FAA. Hibbard correctly contends that the care provided to her occurred only within the borders of Kentucky, but this is not the relevant question at issue. As another court explained in a similar case, "[t]he food, medicine, and durable medical supplies that [the plaintiffs] provided must come from somewhere." *Warner*, 2013 WL 6796421 at *8. There is no suggestion by Hibbard that the services rendered by the plaintiffs were done so without the use of *any* goods purchased through interstate commerce, and the Court would be skeptical of such a claim. More importantly, the "general activity" of providing healthcare to Hibbard—even if contained to an intrastate market in this individual case—is without a doubt the kind of activity that in the aggregate is subject to federal control under the Commerce Clause. *See Warner*, 2013 WL 6796421 at *7–8. The arbitration agreement in

15

this case is a component of a larger contract that evidences a transaction involving interstate commerce.

The arbitration agreement in this case is valid and enforceable under both the FAA and Kentucky law. Because this agreement is valid, Hibbard must submit her claims regarding the care and treatment at her nursing home facility to arbitration according to the agreement's terms.

**B. Injunction Prohibiting Pursuit of Pending State-Court Action**

Having found that Hibbard must submit her claims to arbitration, the question turns to whether this Court should enjoin the defendant from pursuing her parallel action in state court. The Court finds that such an injunction is necessary, and the defendant is enjoined from proceeding with her state-court action. "Although the FAA requires courts to stay their own proceedings where the issues to be litigated are subject to an agreement to arbitrate, it does not specifically authorize federal courts to stay proceedings pending in state courts." *Great Earth*, 288 F.3d at 893 (quoting *Ultracashmere House, Ltd. V. Meyer*, 664 F.2d 1176, 1180 (11th Cir. 1981)) (internal citations omitted). For this reason, "the district court's authority to enjoin state-court proceedings is subject to the legal and equitable standards for injunctions generally, including the Anti Injunction Act." *Id*. Pursuant to the Anti-Injunction Act, "[a] court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, *or to protect or effectuate its judgments*." 28 U.S.C. § 2283 (emphasis added).

An injunction in this case "properly falls within the exception for injunctions 'necessary to protect or effectuate [this Court's] judgments.'" *Great Earth*, 288 F.3d at 894. The Court has determined that the parties entered into a binding arbitration agreement covering the scope of Hibbard's claims. Having made such a determination and compelling Hibbard to submit to

arbitration, it is necessary to enjoin Hibbard from pursing her claims in *any* alternative forum, including state court. Otherwise, Hibbard would be permitted to circumvent her arbitration agreement and in doing so, circumvent this Court's judgment that she be compelled to arbitrate her claims. Accordingly, the Court will order that Hibbard be enjoined from proceeding with her pending state-court action.

### IV.

The Court has found that the plaintiff corporations and Defendant Marilyn O. Hibbard entered into a binding and valid arbitration agreement that covers within its scope Hibbard's claims brought in the pending action in Fayette Circuit Court. Because this agreement is valid, Hibbard must submit her claims to arbitration and is enjoined from proceeding with her state-court action. Accordingly, **IT IS ORDERED** that:

1. The defendant's motion to dismiss (DE 4) is **DENIED**;
2. The plaintiffs' motion to compel arbitration and enjoin the state-court proceedings (DE 6) is **GRANTED**;
3. Marilyn O. Hibbard is **COMPELLED** to submit her claims to arbitration according to the terms of her agreement and **ENJOINED** from proceeding with her action in state court; and
4. The Court will stay this proceeding until the conclusion of the ordered arbitration.

Dated this 4th day of June, 2014.



KAREN K. CALDWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY